UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
                                 :

**MARK WINKLER,**                 :

                                 :         **OPINION AND ORDER**

                 **Plaintiff,**      :         **03 Civ. 9656 (SAS)**

      - against -           :

**METROPOLITAN LIFE INSURANCE**  :
**COMPANY,**

                **Defendant.**     :
-----------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

        Mark Winkler filed this action under the Employee Retirement

Income Security Act of 1974 ("ERISA") against the claims administrator of his

employee benefits plan, Metropolitan Life Insurance Co. ("MetLife"), for failure

to grant him long-term disability coverage.[1] Winkler now moves for summary

judgment declaring that MetLife improperly denied his application for benefits.

MetLife cross-moves for summary judgment dismissing the complaint. For the

following reasons, Winkler's motion is denied and MetLife's motion is granted.

---

    [1]     29 U.S.C. § 1001 (2005).

## II.  BACKGROUND[2]

Winkler is a 45-year-old man who has been HIV positive for over ten years.  He sees a physician regularly and takes a number of HIV medications.[3] Winkler worked as a Vice President and Senior Creative Director for Jack Morton Company ("Jack Morton") until October 10, 2001, when he was terminated during a reduction in force ("RIF") that eliminated the positions of approximately 400 employees.[4]

Winkler alleges that his health began to deteriorate as early as January 2001, due to the worsening of his viral infection and attendant depression.[5]  He also claims that adverse reactions to medications he was taking exacerbated his condition, and he began to experience difficulty sleeping, uncontrolled diarrhea, and an inability to concentrate.[6]  Winkler states that these symptoms made him "increasingly hard to deal with" at work, and in July 2001,

---

[2]   The following facts are undisputed, except where otherwise indicated.

[3]   *See* Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt.") ¶ 5.

[4]   *See* Pl. 56.1 Stmt. ¶ 9; Defendant's Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶ 9.

[5]   *See* Pl. 56.1 Stmt. ¶ 7; Winkler's Disability Application ("Disability App."), Ex. B to Plaintiff's Memorandum of Law in Support of Summary Judgment ("Pl. SJ Mem.") at W 52.

[6]   *See* Pl. 56.1 Stmt. ¶ 7.

his treating physician, Dr. Stephen Dillon, advised him to leave his job.[7] Winkler

continued working, however, even though in his "deteriorated and agitated state"

his work product and relationships with co-workers began to suffer.[8]

According to Winkler, his declining performance eventually became

intolerable, prompting MetLife to terminate his employment in October 2001.[9]

MetLife disputes this claim, arguing that Winkler was terminated solely because

the RIF eliminated his position.[10] However, it is undisputed that, following his

termination, Jack Morton hired Winkler to work for the company on a freelance

basis.[11] This arrangement lasted only for approximately five days and the parties

offer conflicting explanations for its brevity. Winkler asserts he was unable to

function, "even in the reduced capacity of a freelancer,"[12] but a Jack Morton

---

[7]    *Id.* ¶ 8. Dr. Dillon reports that he advised Winkler to stop working in July 2001, but no such advice is reflected in the doctor's contemporaneous office notes. *See* Defendant's Rule 56.1 Response Statement ("Def. Reply 56.1 Stmt.") ¶ 8.

[8]    Pl. 56.1 Stmt. ¶ 9.

[9]    *Id.*

[10]    Def. 56.1 Stmt. ¶ 9.

[11]    *See* Pl. 56.1 Stmt. ¶ 110; Disability App. at W 52.

[12]    Pl. 56.1 Stmt. ¶ 10. *Accord* Oct. Appeal at W 129-32 (Jezra Kaye's statement describing her experience working side-by-side with Winkler during his final days at Jack Morton).

representative told MetLife that Winkler's contribution to the project was completed, after which it was simply "more cost effective to bring that work in-house."[13]

## A.     The Plan

Winkler participated in the Jack Morton Company Employee Welfare Plan (the "Plan"), which provides eligible employee-participants with long-term disability ("LTD") benefits.  Under the Plan, 'disability' means that "due to an injury or sickness, you require the regular care and attendance of a Doctor and . . . you are unable to perform each of the material duties of your regular job . . ."[14] The Plan provides that all benefits end on the date employment ends, which occurs when the employee "cease[s] active work."[15]  An employee is considered "actively at work" on "any day in which [he is] performing in the usual way all the regular duties of [his] work."[16]

---

[13]     MetLife Claim File ("Claim File") (email communication between MetLife and Jack Morton human resources representative Patricia Reese), Ex. B to Def. SJ Mem. at ML 251.

[14]     Def. 56.1 Stmt. ¶ 5; MetLife Summary Plan Description ("Plan Summary"), Ex. A to Defendant's Memorandum of Law in Support of Defendant's Summary Judgment Motion ("Def. SJ Mem.") at ML 546.

[15]     Plan Summary at 552.

[16]     *Id.* at 552, 546; Def. 56.1 Stmt. ¶ 7.

## B. Initial Benefits Review

Winkler applied for LTD benefits in January 2002, three months after his termination, claiming disability resulting from HIV and depression.[17] His application form listed the following treating physicians: Dr. Dillon, a general practitioner who had been treating Winkler's HIV since 1998, and Dr. Jack Almeleh, who Winkler began seeing in November 2001 for depression. Winkler also noted that he had undergone psychotherapy for depression from August 2000 to November 2001 with Judith Clarke, M.S.W.[18] On an Attending Physician Statement ("APS"), Dr. Dillon opined that Winkler's severe fatigue, short-term memory loss, inability to concentrate, and depression rendered him totally disabled, unable to work even a single hour in a day.[19] In a separate letter, Dr. Dillon indicated that Winkler's condition had begun to deteriorate in the summer

---

[17]   *See* Disability App. at W 50-51.

[18]   *See id.*

[19]   *See* Pl. Reply 56.1 Stmt. ¶ 12; Disability App. at W 64-65. The parties offer contradictory interpretations of the APS forms. Winkler reads them as "unambiguously" dating his total disability back to July 2001. MetLife argues that the records are ambiguous on this point; they indicate only that the physicians believed that Winkler was totally disabled at the time they were written, which postdates Winkler's termination. *See* Def. Reply 56.1 Stmt. ¶ 14.

of 2001.[20]

An APS from Dr. Almeleh, whose initial date of treatment with Winkler was nearly a month after Winkler was laid off, echoes Dr. Dillon's assessment that Winkler's depression and HIV left him totally unable to work in any capacity.[21] Judith Clarke furnished a letter stating that Winkler's symptoms of depression began deteriorating as early as July 2001. [22]

In evaluating Winkler's claim, MetLife referred the file to a MetLife nurse consultant who recommended obtaining additional medical and employment information.[23] Accordingly, MetLife requested additional medical and clinical records from Drs. Dillon and Almeleh.[24] MetLife next contacted Jack Morton's Human Resources Department. In response to inquiries about the nature of

---

[20]    Disability App. at W 66. Specifically, Dr. Dillon stated that Winkler "presently" suffered from "complications due to HIV related symptoms and depression. Both of these conditions significantly deteriorated beginning in the summer of 2001 and continue to worsen." He concluded that Winkler is totally disabled.

[21]    *See* Claim File at ML 205-06.

[22]    *See id.* at ML 203.

[23]    *See id.* at ML 264.

[24]    *See* Pl. Reply 56.1 Stmt. ¶ 20. MetLife requested further information from Winkler's therapist, Judith Clarke, but MetLife declined to pay her fee and the information was never obtained.

Winkler's termination, Jack Morton representatives stated unequivocally that he was terminated solely as part of a RIF, there had been "no significant change" in his performance at the time, nor did he demonstrate an inability to do his job.[25] In these communications MetLife also learned of Winkler's post-termination independent contract work for the company.[26]

In light of the information before it, Met Life concluded that Winkler was not disabled under the Plan because his inability to work was not supported by any objective medical records.[27] MetLife's denial letter noted in particular that Winkler was able to work on a daily basis for years despite his HIV; that he was hired to do independent contract work following his termination; and that representatives of Jack Morton had stated that Winkler was laid off solely due to the company's RIF.[28] The denial letter further noted that Winkler did not file his LTD claim until January 2002, whereas the Plan specifies that his eligibility for benefits ended on the date he last worked, which was October 10, 2001.[29]

---

[25]     Claim File at ML 254-55 (email communication between MetLife and Jack Morton Human Resources Personnel).

[26]     *See* File at ML 254-55.

[27]     *See* 4/26/02 Appeal Denial, Ex. C to Pl. SJ Mem. at W 71-72.

[28]     *See id.*

[29]     *See id.*

## C.     The Appeal Process

In preparation for an appeal, Winkler's attorney requested pertinent documents from MetLife, including the criteria MetLife used in determining the extent of his disability.[30]  MetLife's LTD case manager Althea Jones produced certain documents from the claim file, including medical documentation and a diary review containing the telephone calls, e-mails, and referrals relating to his application.  She enclosed a letter reasserting MetLife's position that Winkler failed to show a sufficient decline in his health prior to being terminated.[31]  However, Jones did not, as Winkler had requested, produce the criteria used by MetLife to determine Winkler's disability, or the "directives and policy statements addressed to MetLife claim handlers regarding the evaluation of disability claims involving HIV and/or depression."[32]  Instead, Jones provided a statement of the information Winkler would need to furnish to perfect his claim.[33]

---

[30]     *See* Pl. 56.1 Stmt. ¶ 28.

[31]     *See* Def. 56.1 Stmt. ¶ 27.

[32]     *See* Pl. 56.1 Stmt. ¶27.

[33]     *See* Def. 56.1 Stmt. ¶ 27; Claim File at ML 191-92.  Jones specified that in order to perfect his claim, Winkler would have to submit evidence of sufficient deterioration in health dating back to June or July 2001 and "documentation, in the form of office notes and/or test results" that would "support a decline in his health to the extent that it would preclude him from performing the duties of his own occupation as of the time he last worked through

Winkler appealed his denial of benefits by letter in October 2002,[34] enclosing a report from Sanford Drob, Ph.D., a clinical and forensic psychologist who examined Winkler in July 2002.[35] Dr. Drob opined that although Winkler's own statements suggested "an exaggerated effort to appear disabled," he was nonetheless "psychologically disabled from performing his job functions some time prior to the date of his termination."[36]

To counter MetLife's determination that he was terminated solely because of the RIF, Winkler forwarded MetLife statements written by former co-workers, including one of his supervisors at Jack Morton.[37] These narratives recount changes in Winkler's attitude and his ability to handle his professional

---

the present." *Id.*

[34]     *See* Oct. Appeal at W 92-104.

[35]     *See id.* at W 106. MetLife does not accord great weight to Dr. Drob's report because he did not examine Winkler until July 2002, more than nine months after Winkler's employment at Jack Morton ended. *See* Def. 56.1 Stmt. ¶¶ 23-29. *See also* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp. Mem.") at 9-13.

[36]     Oct. Appeal at W 106.

[37]     *See id.* at W 127-31. In response to MetLife's statement in its denial letter that it was waiting to receive certain requested medical records, Winkler also forwarded MetLife Dr. Dillon's treatment notes and laboratory results. *See id.*

responsibilities.[38] They tell the story of a man becoming uncharacteristically argumentative and erratic, displaying increasing difficulty communicating and making decisions.[39] A woman who worked with Winkler during his last few days as an independent contractor described his altered demeanor and behavior as simply "bizarre."[40]

In processing the appeal, MetLife referred Winkler's claim to Dr. Gary Greenhood, an independent medical consultant who is Board Certified in internal medicine and infectious diseases.[41] MetLife asked Dr. Greenhood to review Winkler's medical reports and determine whether he was indeed totally disabled due to HIV.[42] While it remains unclear exactly what documents were sent to Dr. Greenhood,[43] the record suggests that he received not only the nurse

---

[38]    *See id.*

[39]    *See id.*

[40]    *Id.* at W 130.

[41]    *See* Def. 56.1 Stmt. ¶ 28.

[42]    *See id.*

[43]    *See* Pl. Reply 56.1 Stmt. ¶ 28 (asserting that MetLife neglected to have Dr. Greenhood review the statements of Winkler's co-workers, the full reports of Dr. Dillon, and the full reports of Dr. Almeleh and Clarke who treated Winkler for depression).

consultant diary, but also Dr. Dillon's office visit notes and lab reports.[44]  After

reviewing the materials before him, Dr. Greenhood was "unable to identify a

severity-of-illness sufficiently severe to preclude regular work."  He found that

there had been no "significant clinical changes" in Winkler's viral condition in the

time leading up to his termination.  Dr. Greenhood also suggested that Winkler

was "asymptomatically infected" with HIV.[45]

      According to MetLife, its nurse consultant also conferred with an

independent consulting physician, Dr. Ian Lipsitch, about Winkler's purported

symptoms of depression.[46]  After reviewing documents related to Winkler's

psychological problems, Dr. Lipsitch concluded that there was no clear indication

in the record that Winkler suffered a degree of psychological impairment while

working that would have rendered him unable to carry out his professional tasks.[47]

Rather, Dr. Lipsitch found that the record only substantiated that Winkler's

symptoms worsened after he was terminated.[48]  Dr. Lipsitch also questioned the

---

[44]    *See* Claim File at ML 320-23.

[45]    *Id.*

[46]    *See* Def. 56.1 Stmt. ¶ 29.  The nurse consultant's diary indicates a
discussion with a "psyche IPC(IL)," but does not identify Dr. Lipsitch by name.

[47]    *See* Def. 56.1 Stmt. ¶ 29; Claim File at ML 534.

[48]    *See* Def. 56.1 Stmt. ¶ 29; Claim File at ML 534.

validity of Dr. Drob's report, noting that the forensic psychologist did not examine Winkler until more than nine months after Winkler stopped working.[49]

Following these consultations, MetLife notified Winkler that in light of the new medical reports submitted and obtained, it had decided to maintain its original claim determination.[50] Specifically, MetLife noted that Winkler's supplemental medical reports failed to corroborate a severity of illness or side effects from medication that would have rendered him totally disabled prior to the termination of his LTD coverage.[51] MetLife's letter outlined Winkler's right to further appeal its decision.[52]

Winkler's counsel contacted MetLife again in January 2003, requesting all materials relating to his claim that had not yet been furnished. MetLife supplied additional documents later that month.[53] Winkler then

---

[49]   *See* Def. 56.1 Stmt. ¶ 29; Claim File at ML 534.

[50]   *See* Pl. 56.1 Stmt. ¶ 38; Def. Reply 56.1 Stmt. ¶ 38; Claim File at ML 313-15.

[51]   *See* Claim File at ML 313-15.

[52]   *See id.*

[53]   Althea Jones also enclosed a letter correcting a misstatement in MetLife's December 18, 2002 letter to Winkler's attorney reaffirming its initial claim determination. The earlier letter incorrectly used the word 'subjective' rather than 'objective' in characterizing the type of medical documentation required to perfect Winkler's claim. *See* Pl. Reply 56.1 Stmt. ¶ 32;

supplemented his appeal with additional medical information, including a new report by Dr. Almeleh.[54] This report contained Dr. Almeleh's conclusion – which MetLife had already reviewed in an earlier Attending Physician Statement[55] – that in November 2001, when the doctor first examined Winkler, he exhibited symptoms of depression rendering him "totally unable to work in any capacity at all."[56]

MetLife's Appeal Unit then referred Winkler's claim to an independent psychologist, Dr. John Shallcross.[57] After reviewing a wealth of medical information and narratives written by Winkler's friend's and co-workers on his behalf,[58] Dr. Shallcross ultimately recommended that the file be referred to

---

Correspondence Documents, Ex. A to Pl. SJ Mem. at W 35.

[54] *See* Claim File at ML 68-70.

[55] *See id.* at ML 205-06.

[56] *Id.* at ML 68.

[57] *See id.* at ML 383-89; Def. 56.1 Stmt. ¶ 37.

[58] *See* Claim File at ML 383-89. Specifically, Dr. Shallcross states that he reviewed: (1) the diary notes of MetLife's Nurse Consultant; (2) 6/25/03 letter from Winkler's counsel to MetLife, outlining his grounds for appeal; (3) 12/18/02 letter from LTD Case Manager Althea Jones updating MetLife's denial of Winkler's original claim ; (4) APS and letters of Dr. Almeleh; (5) Psychological Evaluation of Dr. Drob; (6) letters written by Winkler's co-workers Ray Simon, Cynthia Kuker, and Jezra Kaye; (7) 8/21/01 email to Winkler from co-worker Jill Fenton, criticizing Winkler for his "paranoia and hysteria;" (8) Dr. Dillon's

a psychiatric consultant to address the issue of possible side effects from medication.[59]   However, Dr. Shallcross's report also highlighted the fact that none of the psychological test results in the file reflected Winkler's condition while he was employed at Jack Morton.[60]   Indeed, the only available treatment notes for the period leading up to Winkler's termination were those of Dr. Dillon, which, according to Dr. Shallcross, did not reflect an "impairing psychopathology prior to [the date Winkler last worked]."[61]   Dr. Shallcross further remarked that despite reports from Winkler's treating physicians indicating a deterioration in his mental and nervous condition as early as July 2001, there was no objective evidence or results to indicate total disability during this period.[62]

Following Dr. Shallcross's suggestion, MetLife referred the file to

---

medical reports, including his treatment notes and APS; (9) 12/11/01 letter from Judith Clarke, offering her opinions regarding Winkler's depression; (10) Employee Job Description written by Winkler for his initial claim application; (11) undated letter written by Winkler's friend Charlie Kaplan on his behalf; (12) 11/12/02 Physician Consultant Review of Dr. Greenhood; (13) 10/16/02 letter from Winkler's counsel to MetLife, appealing MetLife's initial claim determination.

[59]   *See id.*

[60]   *See id.*

[61]   *Id.*

[62]   *See id.*

psychiatrist Bettina Kilburn, M.D., who reviewed much of the same material evaluated by Dr. Shallcross, including Dr. Dillon's treatment notes.[63] Dr. Kilburn concurred with Dr. Shallcross, declaring that the evidence failed to "reflect an impairing psychopathology prior to [Winkler's termination]" and commenting on the fact that there were no mental health treatment notes describing the claimant's condition prior to that date.[64] She noted the lack of cognitive or neuropsychological testing, ultimately concluding that the available information was "insufficient to definitively demonstrate severe or deteriorated cognitive functioning prior to [termination]."[65] After reviewing all this evidence, including the new evaluations of doctors Shallcross and Kilburn, MetLife upheld its original claim determination.[66]

## III. LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

---

[63]   *See* Def. 56.1 Stmt. ¶ 38; Claim File at ML 390-93.

[64]   Def. 56.1 Stmt. ¶ 38 (quoting Claim File at ML 390-93).

[65]   *Id.* (quoting Claim File at ML 390-93).

[66]   *See* Claim File at ML 380-82.

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[67]  An issue of fact is genuine "if the evidence is such that a jury could return a verdict for the nonmoving party."[68] A fact is material when it "might affect the outcome of the suit under the governing law."[69]

A party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.[70]  In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts,"[71] and it "may not rely on conclusory allegations or

---

[67]    Fed. R. Civ. P. 56(c).

[68]    *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[69]    *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 248).

[70]    *See Security Ins. Co. v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[71]    *Golden Pac Bancorp v. FDIC*, 375 F.3d 196, 200-01 (2d Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

unsubstantiated speculation."[72]  Rather, the opposing party must produce

admissible evidence that supports its pleadings.[73]  In this regard, the "mere

existence of a scintilla of evidence" supporting the opposing party's case will be

"insufficient to defeat summary judgment."[74]

In determining whether a genuine issue of material fact exists, the

court will construe the evidence in the light most favorable to the party opposing

summary judgment and draw all reasonable inferences in that party's favor.[75]

Accordingly, the court's task is not to "weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial."[76]

Summary judgment is therefore inappropriate "if there is any evidence in the

---

[72]     *Cassaboon v. Town of Somers*, No. 03 Civ. 7939, 2005 WL 589327,
at *2 (S.D.N.Y. Mar. 4, 2005) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d
Cir. 1998)).

[73]     *See First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253,
289-90 (1968).

[74]     *Dawson v. County of Westchester*, 373 F.3d 265 (2d Cir. 2004)
(quoting *Anderson*, 477 U.S. at 252).

[75]     *See Jacques v. DiMarzio*, 386 F.3d 192, 294 (2d Cir. 2004) (citing
*Anderson*, 477 U.S. at 255).

[76]     *Anderson*, 477 U.S. at 249.

record that could reasonably support a jury's verdict for the [opposing] party."[77]

## B.    ERISA Standard

This Court has already held that the denial of benefits by a claim administrator will be overturned only if it is arbitrary and capricious.[78]   Under this deferential standard, a court may overturn a decision to deny benefits only if it was "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"[79]  Substantial evidence means "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker."[80] Thus, while I am required to consider whether MetLife's "decision was based on a consideration of the relevant factors and whether there has been a clear error of

---

[77]    *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

[78]    *See Winkler v. Metropolitan Life Ins. Co.*, No. 03 Civ. 9656, 2004 WL 1687202, at *3 (S.D.N.Y. July 27, 2004), *reconsideration denied by* 340 F. Supp. 2d 411, 412 (S.D.N.Y. Aug. 24, 2004).

[79]    *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).

[80]    *Cook v. N.Y. Times Co. Group Long Term Disability Plan*, No. 02 Civ. 9154, 2004 WL 203111, at *3 (S.D.N.Y. Jan. 30, 2004) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).

judgment," I may not "upset a reasonable interpretation by the administrator."[81]

On a summary judgment motion, the arbitrary and capricious standard requires a court to "'ask whether the aggregate evidence, viewed in the light most favorable to the [administrator], could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.'"[82] Thus, MetLife's "decision will be upheld unless it is not grounded on any reasonable basis" and I need only assure that the decision "falls somewhere on a continuum of reasonableness – even if on the low end."[83]

## C.    The Requirement of a Full and Fair Review

The statute mandates that all employee benefit plans "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[84] The purpose of a full and fair review is to "provide

---

[81]    *Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 49 (2d Cir. 1996) (citations and quotation marks omitted).

[82]    *Davis v. Commercial Bank of New York*, 275 F. Supp. 2d 418, 425 (S.D.N.Y. 2003) (quoting *Twomey v. Delta Airlines Pilots Pension Plan*, 328 F.3d 27, 31 (1st Cir. 2003) (quotation marks and citations omitted)).

[83]    *Scannell*, 2003 WL 22722954, at *19 (quoting *Cirulis v. UNUM Corp. Severance Plan*, 321 F.3d 1010, 1013 (10th Cir. 2003).

[84]    29 U.S.C. § 1133(2).

claimants with enough information to prepare adequately for further

administrative review or an appeal to the federal courts."[85] According to the

Second Circuit, a full and fair review requires that the claims administrator

"'notify the participant promptly, in writing and in language likely to be

understood by laymen, that the claim has been denied with the specific reasons

therefore.'"[86] The claims administrator "must also inform the participant of what

evidence he relied upon and provide him with an opportunity to examine that

evidence and to submit written comments or rebuttal documentary evidence."[87]

"The Second Circuit has indicated that 'substantial compliance' with

[ERISA's] regulations may suffice to meet § 1133's mandate of a 'full and fair

---

[85]     *Juliano v. HMO of N.J., Inc.*, 221 F.3d 279, 287 (2d Cir. 2000)
(quoting *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir. 1999)). *Accord*
*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("In
simple English, what [full and fair review] calls for is a meaningful dialogue
between ERISA plan administrators and their beneficiaries.").

[86]     *Hammer v. First Unum Life Ins. Co.*, No. 01 Civ. 9307, 2004 WL
1900334, at *4-5 (S.D.N.Y. Aug. 25, 2004)(quoting *Grossmuller v. Int'l Union,*
*United Auto. Aerospace & Agric. Implement Workers of Am.*, 715 F.2d 853,
857-58 (3d Cir. 1983)).

[87]     *Id. Accord Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594,
598 (5th Cir. 1994) (explaining that "full and fair review" means "knowing what
evidence the decision maker relied upon, having an opportunity to address the
accuracy and reliability of the evidence, and having the decision-maker consider
the evidence presented by both parties prior to reaching and rendering his
decision").

review' even when an individual communications from the administrator does not strictly meet the requirement."[88] Several other circuit courts, as well as district courts in this Circuit, have explicitly adopted the substantial compliance rule.[89] Substantial compliance exists where the beneficiary is "supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review."[90] This "more flexible application" of the regulatory requirements "does not indicate that courts do not take them seriously; it merely means that the spirit rather than the letter of the requirements governs."[91]

---

[88] *Cook*, 2004 WL 203111, at *13-14 (finding substantial compliance lacking where administrator failed to notify claimant of right to access relevant documents) (citing *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 107-09 (2d Cir. 2003)) (where notice of denial failed to substantially comply with ERISA and its regulations, time-limitations did not preclude appeal).

[89] *See Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 808 (6th Cir. 1996); *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 127 (4th Cir. 1994); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992); *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1096 (8th Cir. 1992); *Nerys v. Bldg. Serv. 32B-J Health Fund*, No. 03 Civ. 0093, 2004 WL 2210256, at *24 (S.D.N.Y. Sept. 30, 2004); *Cook*, 2004 WL 203111, at *6; *Diagnostic Medical Associates, M.D. P.C. v. Guardian Life Ins. Co.*, 157 F. Supp. 2d 292, 299 (S.D.N.Y. 2001); *Crocco v. Xerox Corp.*, 956 F. Supp. 129, 142-43 (D. Conn. 1997), *rev'd in part on other grounds*, 137 F.3d 105, 108 (2d Cir. 1998).

[90] *Cook*, 2004 WL 203111, at *6 (quoting *Halpin*, 962 F.2d at 690).

[91] *Id.*

## IV. DISCUSSION

### A. MetLife Provided Winkler With A Full And Fair Review

Winkler contends that he was denied a "full and fair review" of his claim. However, under the substantial compliance standard, Winkler's contention is not supported by the factual record. In correspondence to Winkler, MetLife disclosed precisely why it was denying his claim and which information it considered persuasive in making that determination.[92] MetLife explained where Winkler's proffered evidence of disabling HIV and depression was deficient, pointing directly to a lack of objective medical findings substantiating total disability on or prior to October 10, 2001.[93] MetLife's letters also provided adequate notice of Winkler's right to appeal the denial and advised his attorneys how to perfect his claim.[94] Upon request, MetLife furnished Winkler's counsel

---

[92]    *See* Claim File at 313-15 (letter from MetLife to Winkler's counsel listing grounds for the claim denial as including: (1) that Winkler had been infected with HIV since 1991 yet continued working; (2) that Jack Morton human resources representatives informed MetLife that Winkler was laid off solely due to a RIF and that his pre-termination job performance was satisfactory; (3) that Winkler's CD4 cell count and viral load had not significantly increased prior to his termination, leading MetLife's physician consultant to conclude that Winkler had asymptomatic HIV); 380-88 (letter explaining grounds for upholding original claim denial).

[93]    *See* Def. Opp. Mem. at 12-16.

[94]    *See id.*

with claim file documents, including the reports of MetLife's independent physician consultants and the evidence on which their evaluations were based.[95]

In processing Winkler's appeal, MetLife sought the opinions of two physicians who were not involved with the initial claim determination. Both physicians performed comprehensive reviews of the claim file, including the medical reports and the narratives of Winkler's co-workers.[96] MetLife further afforded Winkler a full and fair review by informing him, while his appeal was still pending, that in light of the additional medical reports submitted and obtained it was inclined to uphold its original denial, but that it would still consider additional evidence of disability.[97] Winkler notes that MetLife failed to mention that his file lacked "cognitive/near-psychological testing" until its final denial letter,[98] but this belated specificity does not invalidate MetLife's appellate review in light of MetLife's earlier reiterations that approval for LTD benefits would require objective medical evidence in the form of "office notes and/or test results" substantiating a deterioration in health that precluded him from performing his job

---

[95]    *See id* at 13.

[96]    *See* Claim File at ML 383-84; 390-93.

[97]    *See id.* at ML 313-15.

[98]    Pl. SJ Mem. at 16; 6/25/03 Appeal Denial, Ex. G to Pl. SJ Mem. at W 248.

"as of the time he last worked."[99] Thus, Winkler was afforded an opportunity to

correct the specified deficiencies in his claim and MetLife met its burden of

substantial compliance with the procedural requirements of a full and fair review.

Winkler also argues that he was not afforded a full and fair review

because MetLife failed to discharge its duty to develop a complete record in

determining that he was laid off as part of the company's RIF.[100] Winkler

unjustifiably interprets the requirement of a full and fair review as requiring

MetLife to perform follow-up investigations wherever the evidence is

ambiguous.[101]   In reaching its conclusion that Winkler was terminated due to a

RIF, MetLife considered all of the evidence that was reasonably available to it.

MetLife reviewed narratives of Winkler's co-workers indicating that his

performance deteriorated in the months prior to the RIF, but MetLife also

reviewed the contradictory information it received from Jack Morton's Human

Resources Department.  Specifically, Pat Reese, a Benefits Manager at Jack

Morton unequivocally informed MetLife that Winkler was laid off solely because

of the RIF and that there had been "no significant change" in his job performance

---

[99]     Def. Opp. Mem. at 16 (quoting Claim File at ML 236-37).

[100]     *See* Pl. SJ Mem. at 4-16.

[101]     *See id.* at 4-6; 17-24.

24

prior to his termination.[102] Winkler contends that MetLife should have conducted further investigation to "clarify" this conflicting evidence, but he offers no basis for discrediting Reese as a reasonable, reliable source of information.[103] Given MetLife's discretion to weigh conflicting evidence, Winkler is hard pressed to claim that MetLife's reliance on Reese's information was unreasonable.

Finally, Winkler maintains that the full and fair review requirement mandates that MetLife develop specific guidelines for reviewing claims based on HIV and depression.[104] He argues that such guidelines are necessary to ensure that similarly-situated claimants are treated consistently under the Plan.[105] Yet no case law supports this proposition and ERISA contains no such requirement. Winkler relies on a Department of Labor regulation requiring claims procedures to be "applied consistently with respect to similarly situated claimants."[106] But this regulation does not require plan administrators to create specific guidelines for assessing particular illnesses, such as HIV or depression. As long as MetLife

---

[102]    *See* Defendant's Memorandum of Law in Support of Summary Judgment ("Def. SJ Mem.") at 6; Claim File at ML 251; 254-55.

[103]    Pl. SJ Mem. at 7.

[104]    *See* Pl. SJ Mem at 8, 13.

[105]    *See id.*

[106]    Pl. SJ Mem. at 8, 13 (quoting 29 C.F.R. § 2560.503-1(b)(5)).

substantially complies with ERISA's procedural requirements, MetLife has the flexibility to adjudicate claims on an individual, case-by-case basis.[107]

## B.     MetLife's Determination Was Not Arbitrary Or Capricious

Because MetLife sufficiently complied with the requirements of a full and fair review, the only issue remaining is whether there was substantial evidence in the record to support MetLife's claim determination.  The record strongly suggests that there was.  MetLife reasonably relied on the following evidence in determining that Winkler failed to establish a severity of illness while he was employed at Jack Morton:  (1) Dr. Dillon, Winkler's internist, provided no indication in his treatment notes prior to October 10, 2001, that Winkler was unable to work due to HIV or depression; (2) Although Winkler claimed he was impaired by the side effects of his HIV medications, these medications had not changed since 1999; (3) Independent physician consultant Dr. Greenhood concluded that changes in Winkler's CD4 cell count were not indicative of a severity of illness that would render Winkler unable to work; (4) Dr. Almeleh's opinion was based primarily on Winkler's subjective self-reporting and on an

---

[107]     *See Cook*, 2004 WL 203111, at *7 (holding that "determining whether [a claims administrator] complied with ERISA and its implementing regulations is necessarily a multi-step, fact-intensive inquiry" and observing that the adequacy of compliance with a procedural requirement "must be judged in the context of the determination that follows") (citing *Halpin*, 962 F.2d at 690).

examination of Winkler that did not take place until after Winkler was terminated; (5) Dr. Drob's opinion that Winkler's depression precluded him from working was based on Winkler's subjective self-reports and was Dr. Drob did not examine Winkler until nine months after he was laid off; (6) There was no objective evidence or test results substantiating Winkler's cognitive defects; (7) The four independent physicians or psychologist consultants commissioned by MetLife all opined that there was insufficient medical evidence to show that Winkler was unable to work prior to his termination; (8) the narratives of Winkler's co-workers were contradicted by Jack Morton Human Resources personnel who stated that Winkler's work was satisfactory prior to October 10, 2001.[108]

In light of this evidence, MetLife's decision can hardly be considered an unsupported abuse of discretion. MetLife's conclusion is supported by substantial evidence, much of it coming from the four consultants MetLife commissioned to review Winkler's claim. The evaluations of doctors Greenhood, Lipsitch, Shallcross, and Kilburn were conclusive: all found that the record lacked objective evidence proving a severity of symptomatic HIV or depression that would have precluded Winkler from working.[109]

---

[108]   *See* Def. SJ Mem. at 16-17.

[109]   *See id.*

The earliest medical opinion that Winkler was disabled came in November 2001, a month after Winkler was terminated, when he consulted Dr. Almeleh regarding his depression.[110] This opinion, and others subsequently submitted declaring that Winkler was disabled prior to his termination, do not undermine the reasonableness of MetLife's determination that there was insufficient medical evidence of a disability. The "'mere existence of conflicting evidence does not render [MetLife's] decision arbitrary or capricious.'"[111] Nor was it unreasonable for MetLife to insist on objective evidence in order to evaluate coverage under the Plan.[112]

Winkler raises two specific objections to MetLife's determination.

---

[110] *See id* at 19; Claim File at ML 207-08.

[111] *Lekperic v. Building Service 32B-J Health Fund*, No. 02 CV 5726, 2004 WL 1638170, at *4 (E.D.N.Y. July 23, 2004) (quoting *Rosario v. Local 32B-32J*, No. 00 Civ. 7557, 2001 WL 930234, at *4 (S.D.N.Y. Aug. 16, 2001).

[112] *See Couture v. UNUM Provident Corp.*, 315 F. Supp. 2d 418, 432 (S.D.N.Y. 2004) (noting that "even in cases where diagnosis is difficult and subjective experience of pain and fatigue is the gravamen of the disease, an insistence on objective evidence, standing alone, is not arbitrary and capricious") (citing *Cook*, 2004 WL 2031); *Maniatty v. UNUM Provident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("[i]t is hardly unreasonable for the administrator to require an objective component to such proof."), *aff'd*, 62 Fed. App. 413 (2d Cir. 2003) (unpublished decision), *cert. denied*, 2003 WL 21947187 (Oct. 20, 2003); *Alakozai v. Allstate Ins. Co.*, No. 98 Civ. 3720, 2000 WL 325685, at *7 (S.D.N.Y. Mar. 28, 2000) ("It was not unreasonable for MetLife to require objective evidence as 'proof' of 'total disability.'").

*First,* Winkler argues that MetLife's decision was arbitrary and capricious because MetLife "unreasonably relied" on the fact that Winkler worked full time until being terminated as "dispositive" evidence that he was not disabled.[113] This assertion is wholly unsupported by the record. Rather, the record suggests that MetLife considered a number of factors in reaching its decision, giving particular attention to Winkler's claims that he was disabled as a result of HIV and depression. Furthermore, it was not unreasonable for MetLife to consider Winkler's post-termination freelance work as indicative, albeit inconclusive evidence, of his ineligibility for benefits under the Plan.[114] Winkler's reliance on the Second Circuit's recent holding in *Locher v. UNUM Life Ins. Co. of Am.,*[115] is misplaced. *Locher* stands for the proposition that where eligibility for LTD benefits expires on the last day of employment, the fact that an employee worked

---

[113]    *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp. Mem.") at 2.

[114]    *See Kunstnaar v. Connecticut Gen. Life Ins. Co.,* 902 F.2d 181, 184 (2d Cir. 1990) (upholding a denial of benefits where claimant worked full time until his termination and failed to present "any evidence" that he met his plan's definition of disability prior to the expiration of his coverage). *See also Gooden v. Provident Life & Accid. Ins. Co.,* 250 F.3d 329, 333-34 (5th Cir. 2001) (holding that administrator did not abuse discretion in denying disability benefits where employee failed to provide sufficient evidence substantiating an inability to work prior to his termination due to a RIF).

[115]    389 F.3d 288 (2d Cir. 2004).

full-time up until that date does not, *by itself*, constitute a ground for denying that employee's disability claim, where the employee is able through other evidence to show that she was disabled prior to termination.[116] Nothing in *Locher* prohibits MetLife from taking into account Winkler's ability to work before (or after) his termination as one factor among others.

*Second,* Winkler contends that MetLife's denial of benefits was arbitrary and capricious because MetLife failed to defer to the opinions of Winkler's treating physicians.[117] This is particularly arbitrary, Winkler argues, because MetLife instead relied on the conclusions of doctors who possessed inferior, "secondary" knowledge of Winkler's medical condition.[118] However, the Supreme Court has held that a Plan administrator is "not obliged to accord special

---

[116]    *See id* at 297 ("[C]laimants who can establish absences and resignation based upon an inability to continue working should be able to claim that their disability prevented them from performing the duties of their occupation.").

[117]    *See* Plaintiff's Opp. Mem. at 13-25.

[118]    *Id.* at 23-24. MetLife furnished its physician consultants with a variety of material from Winkler's file, although the parties dispute exactly which materials were reviewed by each physician. Drs. Shallcross and Kilburn indicated in their reports that they reviewed comprehensive files that included medical records, Winkler's personal statements, and his co-workers' narratives. *See* Claim File at ML 383-84, 390-93.

deference to the opinions of treating physicians."[119] The Court further held that "courts [may not] impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[120] Accordingly, MetLife is not required to credit the diagnoses of doctors who personally examined Winkler over the opinions of the physicians consulted by MetLife.[121] Although MetLife's physician consultants made their final determinations without conferring with examining physicians, MetLife's reliance on their reports was not unreasonable. MetLife has discretionary authority to weigh competing medical opinions and to determine, based on all the evidence in the record, whether a claimant is disabled under the Plan.[122]

---

[119]     *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). *Accord Wagner*, 2003 WL 21960997, at *5; *Scannell*, 2003 WL 22722954, at *5.

[120]     *Black & Decker Disability Plan*, 538 U.S. at 834.

[121]     *See Scannell*, WL 22722954, at *5; *Alakozai*, 2000 WL 325685, at *7. Winkler makes a similar argument regarding the declarations of his co-workers, contending that they deserved greater consideration than that afforded by MetLife because these individuals worked side-by-side with Winkler and purportedly witnessed first-hand a deterioration in his job performance indicative of total disability. *See* Pl. Opp. Mem. at 22-23. Again, this argument fails because MetLife had discretionary authority to determine the weight to be accorded to competing evidence.

[122]     *See Tholke v. Unisys Corp.*, No. 01 Civ. 5495, 2004 WL 2339480, at *8 (S.D.N.Y. Oct. 18, 2004) (holding that a plan administrator "reasonably exercised its discretion" in reviewing the opinions of claimant's treating physicians, but choosing to rely on the diagnoses of doctors consulted by the

None of the opinions on which MetLife relied in making its decision were unreasonable or irrational; nor can they be construed, on their face, as products of bias or self-interest.[123] Accordingly, this Court cannot conclude that MetLife's denial of benefits fell outside the realm of its discretion so as to constitute an arbitrary and capricious decision.

## V. CONCLUSION

For the foregoing reasons, MetLife's motion for summary judgment is granted and Winkler's cross-motion is denied. The Clerk of the Court is directed to close these motions [#23, 47] and this case.

---

administrator).

[123] *See Scannell*, 2003 WL 22722954, at *5; *Alakozai*, 2000 WL 325685, at * 7. Winkler also challenges the objectivity and independence of MetLife's reviewing physicians and the completeness of the files on which their opinions were based. *See* Pl. SJ Mem. at 17-24. Whatever flaws he might have identified in these areas, they are insufficient in themselves to render MetLife's determination arbitrary and capricious. *See Cook*, 2004 WL 203111, at *19 (holding that although plaintiff submitted evidence "indicat[ing] possible bias on the part of the reviewing physicians and the protocols they utilized, it is insufficient to discredit their medical conclusions, which appear to have been based, at least in part, on permissible evaluations of the sufficiency of the evidence plaintiff submitted").

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 18, 2005

**For Plaintiff:**

Scott M. Riemer, Esq.
60 East 42nd Street, 47th Fl.
New York, New York 10165
(212) 297-0700

**For Defendant:**

Steven B. Getzoff, Esq.
Allan M. Marcus, Esq.
Lester Schwab Katz & Dwyer, LLP
120 Broadway, 38th Floor
New York, New York 10271
(212) 964-6611